## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 14 2019, 9:48 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark F. James
Anderson, Agostino & Keller P.C.
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: St.W. and Se.W. *(Minor Children),*

and

A.W. *(Father)*

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

June 14, 2019

Court of Appeals Case No. 18A-JT-3154

Appeal from the St. Joseph Probate Court

The Honorable James Fox, Judge

Trial Court Cause Nos.
71J01-1711-JT-120
71J01-1711-JT-121

**Robb, Judge.**

# Case Summary and Issue

[1]     A.W. ("Father") appeals the involuntary termination of his parental rights to St.W. and Se.W. (collectively, the "Children").[1] The sole issue Father presents on appeal is whether sufficient evidence supported the termination of his parental rights. Concluding that there was sufficient evidence to support the termination, we affirm.

# Facts and Procedural History

[2]     Father and Mother were married for approximately five years, but eventually divorced. They are the biological parents of St.W., born on April 23, 2009, and Se.W., born on October 27, 2011.

[3]     On August 10, 2016, the Indiana Department of Child Services ("DCS") received a report that Father had sexually abused the Children. The report indicated that the Children were living in an apartment with Father, Father's fiancée, E.B., and E.B.'s children.[2] The supervising family case manager ("FCM") who received the report traveled to the apartment and presented a notice of detention to E.B., as Father was not present, informing E.B. "that [the FCM was] detaining [the Children]" and would be transporting them to a child

---

[1] L.T. ("Mother") executed consents to the Children's adoption prior to the termination hearing and does not participate in this appeal.

[2] Father testified at the termination hearing that, in August 2016, he and the Children lived with Father's mother during the workweek and spent the weekends at E.B.'s apartment with E.B. and her children.

advocacy center to be forensically interviewed. Transcript of Evidence, Volume 2 at 8.

[4] During the forensic interview, St.W., who was seven years old at the time, alleged that she had been sexually abused by her paternal uncles and Father. Se.W., who was four years old at the time, alleged that she had been sexually abused by Father and by an uncle. Se.W. also disclosed that her two uncles touched her inappropriately while she was living in her paternal grandmother's home, and that Father knew of the incident. Based on the information obtained during the interviews, the Children were not returned to Father's home and were eventually placed with Mother.

[5] On August 12, 2016, DCS filed a petition alleging that St.W. and Se.W. were children in need of services ("CHINS"). On September 12, 2016, the probate court held an initial hearing and, based upon Mother's and Father's admissions to the allegations set forth in the CHINS petition, adjudicated the Children CHINS. Two days later, the probate court issued an order directing the Children to be removed from Mother's home and placed with their maternal grandmother.

[6] On October 5, 2016, the probate court issued a dispositional order, inclusive of a parent participation plan, which directed Father to do, among other things, the following: (1) "notify the [FCM] of any changes in address . . . within five days of said change"; (2) "allow the [FCM] or other service providers to make announced and unannounced visits" to his home; (3) "[i]f a program [or

programs] is/are recommended by the [FCM] or other service provider, . . . enroll in that program [within] a reasonable time, not to exceed thirty days and participate in that program without delay or missed appointments"; (4) keep all appointments "with any service provider, DCS, or CASA/GAL"; (5) "maintain suitable, safe and stable housing with appropriate bedding, functional utilities, [and] adequate supplies of food"; (6) "secure and maintain a legal and stable source of income"; (7) "complete a parenting assessment and successfully complete all recommendations developed as a result of the parenting assessment"; (8) "complete a psychological evaluation[]"; and (9) not permit the Children's paternal uncles to have any access to or communication with the Children. Appellant's Appendix, Volume 2 at 21-22.

[7] DCS filed a progress report on December 15, 2016, indicating that Father had been compliant with the dispositional order and that the permanency plan was reunification. Following the three-month progress hearing, held on January 4, 2017, the probate court found Father to be in compliance with the dispositional order. On February 3, 2017, a court appointed special advocate ("CASA") was appointed for the Children  On February 8, 2017, the probate court granted DCS's motion to modify the dispositional decree and ordered the Children to be placed with their maternal cousin.

[8] DCS filed its six-month progress report on April 3, 2017. The permanency plan remained reunification. At the six-month periodic case review hearing, held on April 5, 2017, the probate court (among other things) approved the Children's continued placement with their maternal cousin. However, on June 26, 2017,

DCS filed a Motion for Emergency Change in Placement. The motion was granted on the following day, and the Children were placed in foster care. The progress report that DCS filed on August 4, 2017, changed the permanency plan to reunification and adoption. On August 9, 2017, the probate court held a twelve-month permanency hearing and approved the change in the permanency plan, i.e., "Reunification with a concurrent plan of adoption." Exhibits at 128.

[9]    On December 15, 2017, DCS filed its Verified Petition for Involuntary Termination of the Parent-Child Relationship, requesting that the probate court terminate Mother's and Father's parental rights as to the Children. On August 3, 2018, DCS filed a progress report changing the permanency plan to adoption, based in part on the following:

> Father has been attending individual therapy after a significant lapse in any services. He has made minimal progress towards the children's disclosures and has called them liars when addressing their claims about sexual abuse. Father had asked if he would be able to write letters, however he has not provided FCM with any letters to give to the children's therapists.

*Id.* at 151. It was recommended that Father have no visitation with the Children. On August 8, 2018, a twelve-month permanency hearing was held, and the probate court accepted the progress report and approved the permanency plan of adoption.

[10]    The probate court held the termination of parental rights ("TPR") hearing on October 19, 2018, and, after hearing evidence, took the matter under

advisement. On December 11, 2018, the probate court issued findings of fact and conclusions thereon and granted the TPR. Father now appeals. Additional facts will be provided as necessary.

# Discussion and Decision

## I. Standard of Review

[11] Although we acknowledge that the parent-child relationship is "one of the most valued relationships in our culture," we also recognize that "parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Bester v. Lake Cty. Office of Family & Children,* 839 N.E.2d 143, 147 (Ind. 2005) (internal quotations omitted). The involuntary termination of one's parental rights is the most extreme sanction a court can impose because termination severs all rights of a parent to his or her children. *See In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.* As such, termination is intended as a last resort, available only when all other reasonable efforts have failed. *Id.* The purpose of terminating one's parental rights is not to punish the parent, but rather to protect the child. *Id.*

[12] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to

the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*; *cert. denied*, 534 U.S. 1161 (2002). Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[13] When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester*, 839 N.E.2d at 147. First, we determine whether the evidence supports the findings, and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

## II. Statutory Requirements

[14] "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008).

[15] For our purposes, to terminate a parent-child relationship, DCS must have alleged and proven by clear and convincing evidence that:

(A) that one (1) of the following is true:

> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree[; or]

> \*\*\*\*\*

> (iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied[; or]

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child[;]

> \*\*\*\*\*

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added).

## III. Sufficiency of the Evidence

[16] Father first challenges the sufficiency of the evidence supporting the probate court's findings as to subsection (b)(2)(B) of the termination statute cited above, that is, remedy of conditions resulting in removal and threat to child's well-being. *See* Ind. Code. § 31-35-2-4(b)(2)(B). He also challenges whether termination was in the best interests of the Children. Initially, we observe that subsection (b)(2)(B) of the termination statute is written in the disjunctive. Thus, DCS was required to establish only one of the two requirements of the subsection by clear and convincing evidence. *See L.S.*, 717 N.E.2d at 209. Nevertheless, the probate court determined that both conditions of this subsection had been satisfied.[3] We, however, need only consider whether sufficient evidence supports the probate court's determination that there is a reasonable probability the conditions resulting in the Children's removal from Father's care will not be remedied.

---

[3] The probate court concluded that the evidence clearly and convincingly established a reasonable probability that Father would not remedy the conditions resulting in the Children's removal and that continuation of the parent-child relationship between Father and the Children posed a threat to the Children's well-being. *See* Appellant's App., Vol. 2 at 77.

# A. Remedy of Conditions Resulting in Removal

[17] The Children were removed from Father's care because the Children accused him and their paternal uncles of sexually abusing them. On appeal, Father argues that DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the conditions that resulted in the Children's removal from his care would not be remedied. Father maintains that, although "the [C]hildren were removed initially because of allegations of inappropriate touching[, t]here was testimony [presented at the TPR hearing] that Father kept appointments, maintained suitable housing, maintained employment, completed parenting classes, completed a psychological evaluation, participated in counseling, and complie[d] with the no contact order." Appellant's Brief at 10 (citations to record omitted).

[18] In deciding whether the conditions that resulted in a child's removal will not be remedied, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. It must evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id*. Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*.

[19] The juvenile court also may consider, as evidence of whether conditions will be remedied, the services offered to the parent by DCS, and the parent's response to those services. *Id.* at 1252. A juvenile court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). A pattern of unwillingness to deal with parenting problems and to cooperate with counselors and those providing social services, in conjunction with unchanged and unacceptable home conditions, will support a finding that there exists no reasonable probability that the conditions will change. *Matter of D.B.*, 561 N.E.2d 844, 848 (Ind. Ct. App. 1990).

[20] In reaching its conclusion that the evidence established a reasonable probability that Father would not remedy the conditions resulting in the Children's removal, the probate court found as follows:

> 73. . . .
> a. Father has made little progress in therapy;
> b. Father insisted that the children were lying for almost two (2) years;
> c. Father has demonstrated that he has not been prepared to help or support his children;
> d. Father has demonstrated an inability to appreciate the trauma or the needs of his own children;
> e. Despite finally admitting that his children are not lying[,] Father has done little if anything to otherwise comply with the Dispositional Order;

f.    Father's continued refusal to admit that his children were abused, keep them safe, or work collaboratively toward reunifying his family;

*****

h.    [The uncles] still live with paternal grandmother, and Father still resides with [his fiancée, E.B.]; . . . .

Appellant's App., Vol. 2 at 76-77. We find that the testimony presented at the TPR hearing supports the probate court's findings and the court's ultimate conclusion that the conditions resulting in the Children's removal would not be remedied.

[21]    Father's fiancée, E.B., admitted that in December 2015, eight months prior to DCS involvement, St.W. disclosed that her two uncles and a cousin had touched her inappropriately. E.B. did not report the abuse to DCS or law enforcement. Father admitted that he was aware of the allegations against the uncles, a cousin, and himself but did not report the allegations because he thought that St.W. was lying. Father continued to allow the uncles and the cousin to have contact with the Children.

[22]    Testimony was presented that Father made multiple statements that the Children lied about the sexual abuse and that Mother was to blame. For instance, after viewing the Children's forensic interviews, Father stated in therapy that "he felt like something happened with the kids[.]" Tr., Vol. 2 at 53. However, Father said it was "hard for him to believe that" the paternal uncles could have sexually abused them "because right after [Father] saw one

[of] the videos, he actually saw one of the uncles, and it was kind of hard for him to process that and even to look at the uncle for a little while." *Id.* At the TPR hearing, Father testified that "at the beginning of the situation," he thought the Children were lying, but that "after going through the coping skills [therapy] and everything that I've gone through, I no longer believe they're liars, but believe something has happened." *Id.* at 123. Nevertheless, he blamed the Children's significant behavioral issues, including bed wetting and anger issues, on their visits with Mother. However, Mother had very limited contact with the Children prior to the filing of the CHINS case and had not seen them in the six months prior to the filing of the CHINS petition.

[23] Per the Dispositional Order, Father completed a psychological evaluation with Dr. Warren Sibilla, a clinical psychologist. Dr. Sibilla testified that he found Father's answers during the evaluation defensive and that Father sought to "portray himself in an overly positive manner . . . ." *Id.* at 31. Father worked with George Prosper, his therapist, for one year. Prosper reported that Father attended therapy regularly but made little progress. Prosper initially worked to complete the therapy goals that Dr. Sibilla recommended and attempted to work with Father on parenting skills. However, Father told the therapist that "he's not going to get the kids back because he doesn't see that happening[,]" and that there was no need to discuss parenting skills. *Id.* at 56. So, the therapy sessions centered on helping Father deal with the stress caused by the case.

[24] The CASA, Rebecca Peterson, testified that Father became angry with her when she tried to discuss the case with him, and, on one occasion, when the

two were talking on the phone, Father hung up her. The CASA further testified that "as long as [Father] maintains that [the Children] are lying, that that prohibits any improvement in the situation[,] and at least what [Father]'s expressed to me has always been what's in [Father's] best interest." *Id.* at 62.

[25] The ongoing FCM, Deborah Banghart, was asked at the TPR hearing if the reasons that led to the Children's removal from Father had been remedied. She stated, "No," and explained: "He has made several statements that have been reported to me that the children have lied and has spent quite a bit of time telling me that [M]other is to blame for this." *Id.* at 83. She further explained:

> I think that the children have both verbalized that they are afraid he's going to take them. Even when mom has had visits, they've been afraid that dad would show up and take them during visits. [St.W.] has, on three separate occasions in front of me, said that dad has touched her inappropriately and those issues have not been resolved for those children.

*Id.*

[26] Given this evidence, we find that DCS proved by clear and convincing evidence that the conditions resulting in the Children's removal would not be remedied. The probate court's findings are not clearly erroneous.

## B. Best Interests of Children

[27] Father also argues that there was insufficient evidence to support the probate court's conclusion that termination of Father's parental rights was in the Children's best interests. In determining what is in the best interests of the

children, the trial court is required to look beyond the factors identified by DCS and to look to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* The court need not wait until the children are irreversibly harmed before terminating the parent-child relationship. *Id.* The recommendation by both the FCM and CASA to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *See Ramsey v. Madison Cty. Dep't of Family and Children,* 707 N.E.2d 814, 818 (Ind. Ct. App. 1999) (concluding that a counselor's testimony that it would be in the child's best interest to terminate the parent-child relationship, "along with the evidence that the condition will not be remedied and that the relationship poses a threat to Child" was sufficient to show by clear and convincing evidence that termination was in child's best interest).

[28] Evidence was presented at the TPR hearing that when the Children were in Father's care, they experienced trauma and that, after being removed from Father's care and placed in foster homes, the Children showed significant signs of improvement in their behavior and overall well-being. For example, Dr. Sibilla conducted psychological evaluations of the Children and determined that the Children suffered from "Significant Trauma Disorder made worse by the impulsivity association with ADHD and then the Oppositional Defiant

Disorder." Tr., Vol. 2 at 25. The Children's family service coordinator, Karen Young, observed that when she first began meeting with Se.W., the child

> had a lot of anxiety. There was aggression. She was angry a lot, very, very impulsive. . . . Now[, after participating in the skills training,] she's doing really good. It took us a while. . . . She struggled in all of [her family placements], especially building relationships with people. That was her biggest hangup [sic] is trust, and the family that she's in now[,] she has developed a very strong bond with. She is at the top of her class in school and you can see her smiling all the time.

Id. at 42-43. Regarding St.W., Young testified that the child had "a lot of anxiety. She had some aggression. . . . [St.W.] did a lot of self stimulating [sic] . . . . She would sit on the floor or on the heel of her foot and when she was overly anxious, especially in a group situation[,] and stimulate her private areas. It was a self-calming skill for her." Id. at 44-45. Young further testified that after working with St.W., Young "saw a lot of growth in [St.W.] in that short period of time. . . . [She] is now at grade level reading. . . . [S]he's able to trust the foster family that she's with and have those conversations when she's anxious or nervous or afraid of something." Id. at 45-46. Young also testified that "[b]oth girls are afraid that [Father will] come and take them. . . . [A]nd both girls have been very consistent in saying they don't ever want to go home with him." Id. at 48.

[29] The mental health therapist testified that when she began therapy sessions with St.W., the child would soil herself when she talked about the trauma she experienced when she was under Father's care. The therapist further testified

that when the therapy sessions ended, she saw St.W. "growing into a [sic] more of a healthier child in a loving [foster] home learning to trust and security. . . . She's doing great in school. She's learning to express herself, able to write her feelings down in a journal each day." *Id.* at 72-73.

[30] At the TPR hearing, Father testified that he had been steadily employed for the last four years, working first as an automotive seat upholsterer and later as a machine operator. However, regarding maintaining stable housing, Father testified that in the six months prior to the hearing, he lived with his mother for three months and then with his fiancée for three and a half months. At the time of the hearing, he resided in a home with his fiancée, seven children, and his fiancée's ex-husband. As for keeping FCM Banghart informed of any changes of address, Father testified that he had been unable to notify the FCM of his change of address because his "phone ha[d] been shut off for about a month[.]" *Id.* at 127.

[31] The CASA supported the termination of Father's parental rights and adoption of the Children by their foster families. She testified as follows regarding the Children's well-being since being removed from Father's care:

> [Se.W.], at the beginning of the school year they did testing that's supposed to be like the base-line standardized testing and she got the highest grade out of everybody in her class because she did a lot of workbooks and worked with the foster parents over the summer while she was there. [St.W.] is doing a lot better. . . . [S]he's very close to one of her foster brothers. I mean, she's close with the whole family but very close with the one that's closest in age with her.

Early on both of [the Children] were very angry, very obstinate, didn't take direction well. I also saw some aggression with family pets and different things like that and I haven't witnessed any of that. They're both very polite and respectful when I see them now. [Se.W.], specifically, has told me that she likes working with animals and she has a lot of animals in the home that she lives in now and she's told me how, you know, that she's learned that you can't be mean to them just like you can't be mean to people, so it's been really good for them.

*****

Like I said before, it seems like [the Children] really have a difficult time when things change or they are unsure. They've both asked and stated that they're worried that somebody is going to take them away from where they are now and that things are going to change again because they've had so many different placements.

*****

They really need that consistency and permanency so that they know that they're safe and that they can move forward with their progress.

*Id.* at 63-64.

[32]    FCM Banghart also supported termination of Father's parental rights. She testified as follows regarding the concerns for the Children's well-being if Father's rights were not terminated:

Court of Appeals of Indiana | Memorandum Decision  18A-JT-3154 | June 14, 2019          Page 18 of 21

I think these children need to feel safe and stable. They have done very well in the placements that they are in. I've seen them grow and although they still have issues with bed wetting and nightmares and things like that, they have been able to verbalize their feelings. They have improved in several areas of their life, however, knowing that they have made statements that they are afraid of [F]ather taking them and they have had the reactions they have when they've discussed the alleged abuse, that those issues have not been resolved for them to provide safety and stability.

*Id.* at 84.

[33] In light of the evidence presented, we find that the probate court's conclusion that termination of Father's parental rights was in the Children's best interests is supported by clear and convincing evidence.

## C. Due Process

[34] Father also briefly contends that his right to due process was violated. He maintains that he was "denied due process in the underlying CHINS case because he was not allowed to have contact with his children unless the therapists recommended it[,]" however, he "could not progress in therapy unless he admitted to the allegations of inappropriate touching[.]" Appellant's Br. at 11. According to Father, "[t]his 'coerced' admission may have allowed [him] to see his children, and it would have violated his right not to incriminate himself, protected by the Fifth Amendment to the United States Constitution

and the Indiana Constitution.["4] *Id.* Father also takes issue with DCS's failure to arrange for Father to participate in a second psychological evaluation.[5]

[35] However, beyond these broad assertions, Father fails to make any specific arguments regarding the alleged violations of his due process rights, and he cites no authority in making his assertions. Therefore, we find Father has waived these arguments on appeal, as he failed to support them with cogent argument. *See* Ind. App. Rule 46(A)(8)(a) (requiring contentions to be "supported by cogent reasoning" and "citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on").

# Conclusion

[36] Based on the foregoing, we conclude DCS presented sufficient evidence that there is a reasonable probability that the reasons for the Children's removal from Father's care will not be remedied and conclude that the totality of the evidence supports the probate court's conclusion that termination of Father's

---

[4] Although Father stopped believing the Children were lying and, at some point, came to the realization that "something" had happened to them, he did not admit to sexually abusing them. However, even if Father had chosen to avail himself of the Fifth Amendment privilege, we remind him that he "does so at his peril" because the Fifth Amendment does not forbid adverse inferences against a party to a civil proceeding who refuses to testify in that proceeding. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them"); *see also Hardiman v. Cozmanoff*, 4 N.E.3d 1148, 1152 (Ind. 2014).

[5] After completing Father's initial psychological evaluation, Dr. Sibilla recommended that Father participate in therapy and then complete a second psychological evaluation. The second psychological evaluation did not occur.

parental rights is in the Children's best interest. The judgment of the probate court terminating Father's parental right is therefore affirmed.

[37] Affirmed.

Baker, J., and Najam, J., concur.